UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | No. 3:19-cr-00167 (VLB) |
| | : | |
| **TERRANCE SAUNDERS** | : | |
| Defendant. | : | NOVEMBER 5, 2020 |
| | : | |
| | : | |
| | : | |
| | : | |

**MEMORANDUM OF DECISION DENYING
DEFENDANT'S SECOND MOTION FOR RELEASE, [ECF NO. 75]**

Before the Court is Defendant Terrance Saunders' ("Defendant") Second Emergency Motion for Compassionate Release. [ECF No. 75]. Defendant seeks release from incarceration to home confinement based on new information about his cardiac, and other, medical problems, as well as his risk of complications should he contract COVID-19 for a second time while incarcerated at FCI Danbury. For the reasons set forth below, the Court DENIES Defendant's motion.

**Background**

On December 26, 2018, United States Magistrate Judge Sarah A. L. Merriam signed a Criminal Complaint against Defendant Terrance Saunders for Possession with Intent to Distribute and Distribution of Narcotics and Conspiracy to Distribute Narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 846. [ECF No. 1 at 1]. Mr. Saunders was arrested the next day, on December 27, 2018.

Thereafter, on June 24, 2019, Mr. Saunders waived indictment and pled guilty to a one-count information charging him with possession with intent to distribute and distribution of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). [ECF Nos. 32, 33].  In his petition to plead guilty, Mr. Saunders hand wrote: "From March 2016 until December 2018, I possessed heroin.  I knew I possessed heroin. I gave the heroin to other people."  [ECF No. 35 at 1-2].

In preparation for sentencing, the Probation Office interviewed Mr. Saunders and filed draft and final pre-sentence investigation reports ("PSR"). [ECF Nos. 47, 48].  In the final PSR, Probation recounted that the investigation into Mr. Saunders' drug distribution activities commenced when a 45-year-old woman died of a heroin overdose in Shelton, Connecticut.  [ECF No. 48 ¶ 7].  The investigation revealed that the day prior to her death, the victim had communicated with Mr. Saunders seven times via cellular telephone.  *Id.* ¶ 9.

Mr. Saunders' offense conduct involved at least 400, but less than 700, grams of heroin, giving him a Base Offense Level of 26, which resulted in a Total Offense Level of 23 after three levels were subtracted for acceptance of responsibility pursuant to his guilty plea.  *Id.* ¶¶ 18-27.

Mr. Saunders' criminal history included two state convictions for drug distribution, for which he was sentenced in August 2013 to concurrent sentences of eight years' imprisonment, with 30 months' imprisonment to serve, and three years' probation.  *Id.* ¶¶ 31, 32.  These convictions, plus one for reckless driving and one for failure to appear, resulted in a criminal history score of six, with two

points added since the instant offense was committed while on probation from his two prior state court drug distribution convictions, for a total of eight, resulting in his placement in Criminal History Category IV.  *Id.* ¶¶ 35-37.  A Total Offense Level of 23 and Criminal History Category IV resulted in a Sentencing Guideline Range of 70 to 87 months' imprisonment.  *Id.* ¶ 60.

The PSR also revealed that Mr. Saunders reportedly suffered from high blood pressure, but "[h]e confirmed that the condition is well controlled by . . . medication."  *Id.* ¶ 47.  "Mr. Saunders [also] stated he underwent a cardiac catheterization at Waterbury Hospital in 2017, but no heart disease was detected."  *Id.*

The Probation Officer reported that Mr. Saunders had been referred to the Midwestern Connecticut Council of Alcoholism, Inc. ("MCCA")[1] in Waterbury for an evaluation on June 11, 2019 in connection with the current case.  *Id.* ¶ 49b.  Records received by Probation indicated that when MCCA questioned Mr. Saunders about "social or leisure activities," Mr. Saunders stated, 'My hobby was selling drugs.'"  *Id.*

On November 22, 2019, the Court sentenced Mr. Saunders to 79 months' imprisonment and three years' supervised release.  [ECF Nos. 57, 60].  Mr. Saunders has been incarcerated since that date and has served approximately eleven months of his 79-month sentence.

---

[1] MCCA is "is the primary provider of substance abuse prevention, evaluation and treatment services in the greater Danbury area," with treatment centers throughout Connecticut.  *See* https://mccaonline.com/about-us/.

On June 9, 2020, Mr. Saunders filed a Motion for Compassionate Relief *pro se*. [ECF No. 65]. In his motion, Mr. Saunders explained that he had already contracted COVID-19, that he was placed in quarantine by himself as a result and was housed in a special segregated unit for inmates who had contracted COVID. *Id.* at 5. Contrary to his representations to the Probation Officer conducting his PSR investigation, he claimed in his motion that he suffered from hypertension, sleep apnea, high cholesterol and an irregular heartbeat. On that basis, he contended that these conditions put him at higher risk for developing serious complications should he again contract COVID-19 while incarcerated, and that this scenario, plus his conviction being only for a "nonviolent drug offense," constituted extraordinary and compelling reasons warranting his immediate release from prison. *Id.* at 6-8. Mr. Saunders also claimed that he had satisfied his exhaustion requirements because he filed a request for release with the warden at Danbury on May 12, 2020, and the warden denied it three days later, on May 15, 2020. *Id.* at 5 n.1.

On June 11, 2020, Attorney Allison Murray Near, of the Office of the Federal Defender, appeared for Mr. Saunders. [ECF No. 66].

On June 15, 2020, the Government opposed Mr. Saunders' motion for release, arguing that:

> Saunders was sentenced to 79 months of imprisonment in this case because he committed a serious drug offense, and because his criminal record dates back 8 years and includes offenses for the same conduct. *See Presentence Report* ("*PSR*"), ¶¶ 31-32. He was sentenced to eight years in prison with 30 months to serve for these prior drug offenses and was still undeterred. *Id.* Saunders was

4

>    dealing heroin to a customer base over a prolonged period of time while on state probation for the identical conduct. This included numerous controlled purchases by law enforcement. Moreover, the quantity of heroin he distributed was significant.

[ECF No. 69 at 7]. The Government also noted Mr. Saunders' description of the instant case as a "nonviolent drug offense":

> To make matters worse, and despite the defendant's characterization that his conviction is nonviolent, as outlined in the PSR and the government's sentencing memorandum, the defendant's conduct resulted in the death of a 45-year old woman. PSR ¶¶ 7-12. Saunders still fails to appreciate the harm his conduct caused to the community and the victim's family in this matter. As I'm sure the Court recalls, the victim impact in this matter was extremely heartbreaking. Plainly put, Saunders is in jail now because he is a repeat offender who is a danger to the community, and he has been a danger to the community for the past eight years. He cannot meet his burden of establishing otherwise, and he is not, therefore, a suitable candidate for release at this time.

*Id.*

The Government also noted that the family of the 45-year-old woman who died following ingestion of heroin sold to her by Mr. Saunders "adamantly oppose[d] the defendant's release." *Id.* at 1. The Government took no position regarding whether Mr. Saunders presented "extraordinary and compelling reasons" in support of his motion, citing "caselaw [that] is developing rapidly," and deferred to the Court's discretion. *Id.* at 6.

On June 18, 2020, Mr. Saunders, through counsel, filed a Reply to the Government's Opposition to Mr. Saunders' Motion for Compassionate Release. [ECF No. 70]. Mr. Saunders appended a letter to the Court to his Reply Brief, expressing regret for his actions as regards the instant matter. *Id.* at 2; [ECF No. 70-1]. He also argued that "extraordinary and compelling reasons" existed

warranting his release, noting that numerous courts in this District had released inmates with pre-existing medical conditions that might make them vulnerable to a COVID infection in prison, even for inmates who had served little time on their sentence. *Id.* at 3-5 (citing cases). Regarding his having already contracted COVID, Mr. Saunders stated that "his risk of reinfection or of not receiving appropriate follow up care puts him at significant risk of long-term complications, reinfection or even death," and, therefore, "prison is the last place he should be." *Id.* at 5. He had a risk of reinfection that could be significant, he argued, citing a World Health Organization press release stating that there is "currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection" and a Journal of the American Medical Association article stating that "in early testing, not all individuals infected with COVID-19 develop antibodies." *Id.* at 8-9.

Mr. Saunders also argued that a sentence reduction was warranted because (1) he followed the rules on pre-sentencing release and had remained incident-free in prison, (2) he had a good home confinement plan living with his sister, Tamika Dawkins, and (3) his father was very ill with Stage IV pancreatic cancer. *Id.* at 11-13.

On June 24, 2020, the Court denied Mr. Saunders' Motion for Release. [ECF No. 74]. The Court found that Mr. Saunders had validly exhausted his administrative requirements prior to filing suit, as required, but that the mere risk of COVID re-infection and its potential effects on him were speculative and therefore Mr. Saunders had failed to clear the extraordinary and compelling

6

circumstances hurdle. *Id.* at 9-10. "This [wa]s especially so given that Mr. Saunders ha[d] already successfully fought off the COVID-19 virus; he apparently ha[d] sufficient biological resources to weather the COVID-19 virus with only mild symptoms, which augers well for his health should he re-contract the virus." *Id.* Moreover, the Court found that Mr. Saunders was "a persistent, unremitting risk to the community" in that "history suggests that if the Court were to release him, he would resort to his old 'hobby' of distributing narcotics, to potentially, once again, lethal effect." *Id.* at 10.

On June 3, 2020, prior to the Court's denial of Mr. Saunders' first release motion, Mr. Saunders filed a renewed request for compassionate release with the warden at Danbury. [ECF No. 75-1]. In the request, Mr. Saunders argued that the Warden had "overlooked [his] chronic medical care, pre-existing health conditions (hypertension – high blood pressure, high cholesterol, and sleep apnea), including the fact that I've already been exposed to the coronavirus and tested positive for COVID-19." *Id.* at 2.

On September 18, 2020, Warden Easter of Danbury denied Mr. Saunders' renewed request, noting that "[y]our medical records reflect you are diagnosed with hypertension, heart disease, and a BMI [body mass index] of 46.2%," but finding that "[y]our conditions are stable with the use of prescribed medication and can be managed at the facility." *Id.* at 3. The warden also noted "[y]our current conviction resulting in the death of a victim . . . as well as the time remaining on your sentence" as reasons that it was "inappropriate" for Mr. Saunders to be released "for placement on home confinement." *Id.*

7

On October 19, 2020, Mr. Saunders, through counsel, filed a second Motion for Release. [ECF No. 75]. The Government opposed the Motion on October 26, 2020, [ECF No. 79], and Mr. Saunders filed a Reply to the Government's Opposition on October 27, 2020. [ECF No.81].

## Legal Standard

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment once it has been imposed'; but the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011) (citations omitted) (quoting 18 U.S.C. § 3582(c)). The statute providing for the finality of a criminal judgment contains a narrow exception to provide for re-sentencing for compassionate release. 18 U.S.C. § 3582(c)(1)(A).

Section 3582(c)(1)(A) authorizes courts to modify terms of imprisonment as follows:

> [T]he court ... upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that ... extraordinary and compelling reasons warrant such a reduction ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

The First Step Act of 2018 amended the procedural requirements for bringing a motion for resentencing to provide compassionate release. First Step Act of

8

2018, Section 603(b), Pub. L. 115-391, 132 Stat. 5194 (2018) (amending 18 U.S.C. § 3582(c)(1)(A)).  Previously, only the Bureau of Prisons ("BOP") could move for compassionate release and such motions were rarely filed.  *United States v. Brooker*, 976 F.3d 228, 231-32 (2d Cir. 2020).  The First Step Act amendments were intended to address past inaction by the BOP by removing the BOP as the sole arbiter of compassionate release, while still permitting the BOP to weigh in on a defendant's request via the statute's exhaustion of administrative remedies requirement.  See *id.* at 4; *see also United States v. Gamble*, No. 3:18-cr-00022-4 (VLB), 2020 WL 1955338, at *3 (D. Conn. Apr. 23, 2020) (explaining the policy purpose behind the exhaustion requirement in this context).

Recently, in *Brooker*, the Second Circuit held that since the BOP no longer has exclusive authority to bring a motion for compassionate release, district courts have the discretion to determine what constitutes "extraordinary and compelling" circumstances outside of the outdated U.S. Sentencing Commission policy statements when the defendant moves for compassionate release.  In short, the statute only requires courts to consider "applicable" statements issued by the U.S. Sentencing Commission and the relevant policy statement, U.S.S.G. § 1B1.13, is no longer "applicable" because the policy statement refers exclusively to a motion brought by the Director of the BOP.  *Brooker*, 976 F.3d at 235-36.  In other words, "[w]hen the BOP fails to act, Congress made the courts the decision maker as to compassionate release."  *Id.* at 235.  Therefore, courts may consider "…the full slate of extraordinary and compelling reasons that an imprisoned person might

9

bring before them in motions for compassionate release," and not just those delineated by the U.S. Sentencing Commission's policy statement. *Id*. at 237.

Consequently, the Court may grant a Defendant's motion for compassionate release if: (1) the Defendant has fully exhausted his administrative remedies or 30 days have passed from receipt of his request by the Warden, and (2) the Court finds that, after considering the Section 3553(a) factors, that "extraordinary and compelling reasons warrant" a reduction of his term of imprisonment.

As to what constitutes "extraordinary and compelling" circumstances, this Court and others have recognized that an inmate's especially heightened risk of infection and risk of developing severe complications from COVID-19 based on their specific medical history may constitute "extraordinary and compelling" reasons to grant compassionate release, often in combination with other factors. *See, e.g. United States v. Jepsen*, 451 F. Supp. 3d 242, 245-47 (D. Conn. 2020) (granting motion for compassionate release when defendant suffered from a compromised immune system and defendant had less than eight weeks remaining on sentence); *United States v. Miller*, No. 3:15-cr-00132-2 (VLB), 2020 WL 3187348, at *5 (D. Conn. June 15, 2020) (granting motion for compassionate release for severely ill defendant with less than three months remaining on sentence).

Courts considering defendants' medical vulnerability from COVID-19 ordinarily look to the CDC's guidance on at-risk health populations. *See United States v. Rivera*, No. 3:13-cr-00071-1 (VLB), 2020 WL 3186539, at *4-5 (D. Conn. June 15, 2020); *see also, e.g., United States v. Adams*, No. 3:16-cr-00086 (VLB), 2020 WL

3026458, at *2 (D. Conn. June 4, 2020); *United States v. McCarthy*, No. 3:17-cr-00230 (JCH), 2020 WL 1698732, at *5 (D. Conn. Apr. 8, 2020). In determining whether a defendant's medical vulnerability to the virus constitutes "extraordinary and compelling" reasons for re-sentencing, courts have considered a multitude of factors in factually intensive inquiries, including: defendants' age, the severity and documented history of their health conditions, defendants' history of managing those conditions in prison, the proliferation and status of infection at defendants' facilities, and the proportion of the term of incarceration that has been served. *United States v. Brady*, No. 1:18-cr-00316-2 (PAC), 2020 WL 2512100, at *3 (S.D.N.Y. May 15, 2020) (citations omitted).

A motion for compassionate release is not an appropriate safety valve to ameliorate the immediate risk to inmates' health and safety posed by the pandemic. Congress empowered the BOP with the ability to expand the use of home confinement pursuant to 18 U.S.C. § 3624(c)(2). CARES Act, Pub. L. No. 116-136 (2020). The BOP is also empowered to grant temporary furloughs. 18 U.S.C. § 3622. In contrast, if granted by the sentencing court, a motion for compassionate release results in a new judgment, with a now-reduced stated term of incarceration. *See, e.g. Jepsen,* 3:19-cr-00073-1 (VLB), [ECF No. 42] (amended criminal judgment following order granting unopposed motion for compassionate release).

The defendant bears the burden of showing that he is entitled to a sentence reduction. *United States v. Gagne*, 451 F. Supp. 3d 230, 234 (D. Conn. 2020) (citing *United States v. Ebbers*, 432 F. Supp. 3d 421, 426-27 (S.D.N.Y. 2020)).

**Discussion**

It is once again undisputed that Mr. Saunders has satisfied the administrative exhaustion requirement for filing a motion for compassionate release. As noted, he filed a renewed request for release with the warden at Danbury on June 3, 2020, and the warden denied it on September 18, 2020. [ECF No. 75-1 at 3-4]. Mr. Saunders has, therefore, satisfied the exhaustion requirement. However, the Court DENIES Mr. Saunders' second motion for compassionate release for the following reasons.

Mr. Saunders argues that he should be released because his "medical conditions have worsened," citing a one-page medical opinion letter written by a doctor from Yale New Haven Hospital. [ECF Nos. 75 at 1, 77-1 at 2]. This letter opines, after a review of Mr. Saunders' medical records, that he suffers from "congestive heart failure," among other ailments, and notes two instances in the medical records of events that were "not standard care." [ECF No. 77-1 at 2]. Mr. Saunders argues that, making things worse, "[h]e also faces the possibility of reinfection with Covid, which would be devastating given his constellation of risk factors," citing an October 12, 2020 NPR online article reporting that a Nevada man has been confirmed, for the first time in the United States, to have a COVID re-infection. [ECF No. 75 at 5 n.3]. This possibility combined with Mr. Saunders' medical condition "constitute[s] extraordinary and compelling circumstances warranting release so that he can receive proper care in the community." [ECF No. 75 at 9].

**The Government opposes Mr. Saunders' motion, noting that even though the 45-year-old woman's family no longer opposes Mr. Saunders' release, he "is not a suitable candidate for release because he is dangerous and poses a substantial risk to the public," citing the deceased victim in this case and noting that he was "arrested for the instant offense while on probation for two State of Connecticut convictions for distribution of narcotics." [ECF No. 79 at 1-2]. The Government takes no position on whether Mr. Saunders' medical conditions constitute extraordinary and compelling circumstances, citing "a divergence of views within the district on this issue," and that "caselaw is still developing rapidly." *Id.* at 6-7. But the Government argues that releasing Mr. Saunders would not be consistent with the applicable sentencing factors because "Saunders has spent the better part of his adult life trafficking narcotics without any real consequences. The [original] sentence, therefore, was intended to carry an appropriate deterrent effect and promote respect for the law. Most importantly, the sentence was intended to protect the public from future crimes of the defendant." *Id.* at 9. The Government sums up by arguing that "[t]he only time [Mr.] Saunders is not a danger to the community is when he is incapacitated through a sentence of imprisonment. As such, Saunders cannot meet his burden of establishing otherwise, and he is not, therefore, a suitable candidate for release at this time," *id.* at 8, especially given that he has only served 11 months of his 79 months' sentence. *Id.* at 10.**

**Mr. Saunders replies that while on release he resided with his sister, who promises to take him in if released now, and that he "was fully compliant with the conditions of his release, maintained stable employment and housing, and**

13

maintained regular contact with his United States Probation Officer." [ECF No. 81 at 5]. Thus, Mr. Saunders argues, the Government's argument that Mr. Saunders must be incarcerated to mitigate his threat to the public is incorrect. In addition, Mr. Saunders notes the harsher than normal conditions of his confinement, including as they did the COVID pandemic, which courts have noted has made incarceration more of a burden than it was previously. *Id.* (citing cases). Mr. Saunders also cites his "strong reentry plan" and various measures the Court can take to mitigate the threat he poses to society, and "asks th[e] Court to give him a chance to demonstrate he can succeed while securing appropriate medical care." *Id.* at 7-9.

As the Court found in its first Order denying Mr. Saunders' motion for release, Mr. Saunders has already demonstrated that the COVID-19 virus is not lethal for him, as he successfully weathered a previous infection. Mr. Saunders has also put forward no evidence that he will or is likely to contract the virus again, or if he did that his condition would be worse now than it was when he contracted the virus previously. The Court notes that at present there are four active positive inmate COVID cases at Danbury out of 887 total inmates, for an active infection rate of only 0.45 percent. https://www.bop.gov/coronavirus/index.jsp. In addition, Mr. Saunders' cited NPR article, which notes that exactly one case exists in the United States of someone being re-infected with the COVID-19 virus, seems to indicate that while COVID re-infection is at least a mathematical possibility, the phenomenon is not widespread.

Moreover, the Court finds that Mr. Saunders' medical condition, while not optimal, is not excessively worse than many other individuals incarcerated in the federal prison system.  The Court finds Mr. Saunders' doctor review of his medical records lacking in clarity; in particular, the EKG result where a reviewing doctor scratched out a possible finding of ischemia, which is characterized as "not standard care," could have been part of a proper review of Mr. Saunders' EKG results based on some other test that the reviewing doctor ran or was aware of, or for some other reason that the Court is unaware of.  In short, the Court does not know what medical care being described as "not standard" means in the prison context, and the warden at Danbury states definitively in his release denial that Mr. Saunders' medical conditions "are stable with the use of prescribed medication and can be managed at the facility," a statement the Court has little reason to disagree with.  [ECF No. 75-1 at 3].

In sum, the Court finds that there are not extraordinary and compelling circumstances warranting release in this case given the speculative nature of the apparently remote possibility of Mr. Saunders being re-infected with the COVID-19 virus and its resulting severity, and the lack of evidence demonstrating that Danbury is a risky place for Mr. Saunders to be housed.  Essentially, Mr. Saunders seeks release so that he can pursue better medical care.  *See* [ECF Nos. 75 at 9 (Mr. Saunders seeks "release so that he can receive proper care in the community"), 81 at 9 (release sought so as to "secur[e] appropriate medical care.")].  The Court is not inclined to reduce Mr. Saunders' sentence from 79 months' incarceration to

home confinement because he takes issue with the Bureau of Prisons' health care system.

Moreover, as the Court found in its Order denying Mr. Saunders' first request for release, Mr. Saunders is a persistent, unremitting risk to the community. The Court agrees with the Government that Mr. Saunders' past actions are strong evidence that incarceration is required to deter him from future drug distribution activities. This is especially so given that Mr. Saunders has served only 11 months of his 79 months' sentence. In sum, the Court finds that the sentencing factors, most importantly specific deterrence as to Mr. Saunders, and the resulting threat to the community, strongly militate against his release.

## Conclusion

For the reasons stated above, the Court DENIES Defendant's Motion for Release.

IT IS SO ORDERED.

\_\_\_\_\_/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated this day in Hartford, Connecticut: November 5, 2020